**Michael RUZICKA and Christie Ruzicka, Plaintiffs–Respondents,**

v.

**RYDER STUDENT TRANSPORTATION SERVICES, INC., a/k/a FIRST STUDENT, INC., Defendant–Appellant,**

and

**Phillip A. BARNHART, Defendant.**

**No. 25435.**

Missouri Court of Appeals, Southern District. Division One.

July 2, 2004.

Randy R. Cowherd, Haden, Cowhert, Bullock & McGinnis, L.L.C., Springfield, Mo., and Thomas R. Larson, Larson & Larson, P.C., Kansas City, for appellant.

John C. Holstein, Shughart, Thomson & Kilroy, P.C., Bradley L. Bradshaw, M.D., J.D., Brad Bradshaw, M.D., J.D., L.C., Eric M. Belk, Eric M. Belk, P.C., Springfield, for respondents.

PREWITT, J.

Michael Ruzicka and Christie Ruzicka brought this personal injury action following a collision between a bus owned by Ryder Student Transportation Services, Inc. ("Ryder") and a haybine or hay baler operated by Michael. The case was heard before a jury, which returned a verdict in Michael's favor in the amount of $2,400,000. The jury found that Christie, Michael's wife, did not sustain damage as a

direct result of the injuries to her husband; thus, there were no damages assessed on her loss of consortium claim.[1]

Ryder raises four points in its appeal, arguing that the trial court erred in refusing to submit the issue of comparative fault to the jury, in admitting the medical restrictions set forth in a particular exhibit and in allowing the testimony of a vocational expert that relied on the information in that exhibit, in permitting plaintiff's counsel to question Michael regarding an advance payment made to him, and in refusing to remit the $2,400,000 award.

### Facts

Viewing the evidence in the light most favorable to the verdict, the following facts were adduced at trial. On June 11, 1999, Michael was cutting hay in a field on property approximately one mile from his home. After cutting for two hours, a couple of sections of the haybine, which was being pulled by a tractor, broke. Michael decided to take the machinery home to fix it. Michael did not have the necessary tools with him to perform the repairs, it was a hot day and there were no trees close by that would allow Michael to work on the machinery in the shade, and it was nearly noon and Michael was hungry.

Although Michael's home was south of the property on which he was cutting hay, he initially traveled northbound on Highway 13, then turned left onto Highway KK, in order to proceed southbound on Highway 13, a divided four-lane highway. Highway 13 provided the only route for Michael to his house, as there was no other highway, paved road, dirt road, or trail that led to his home.

As Michael operated the tractor and haybine along Highway 13, the tractor was positioned in the right, southbound lane, with the haybine partially in that lane and partially on the shoulder. It was not possible for the tractor and haybine to be driven completely on the shoulder because the haybine would have struck markers placed on the side of the highway by the State of Missouri. Michael operated the machinery "as far over to the markers" as possible without hitting them. The left front tractor tire was two feet off the line dividing the two southbound lanes.

Michael's tractor was equipped with an eight-foot-high canopy, as well as headlights, four-way caution lights, implement lights, and running lights, all of which were engaged and operating that day. There was also a "slow moving vehicle" sign on the back of Michael's tractor. Michael was operating the tractor "wide open in road gear" at a speed of 20 to 25 miles per hour.

Also around noon on June 11, 1999, Phillip Barnhart, an employee of Ryder, was driving a bus that was traveling south on Highway 13, approximately three miles south of Bolivar, Missouri. His passengers were youth from the Linwood Baptist Church in Cape Girardeau, and the group was heading back home. There were also five or six adult chaperones on the bus. According to Barnhart, the bus was traveling 55 to 60 miles per hour, and he could see at least one-half mile in front of the bus. The bus was in the right-hand, southbound lane.

As Barnhart was driving, he periodically checked the mirrors for traffic and at some point noticed through the passenger-side mirror that one of the youth had put his hand out the window. Barnhart hollered

---

1. For simplicity sake, we will refer to the Ruzickas by their first names. We mean no disrespect.

twice for the young man to bring his arm back in, but the noise level on the bus precluded anyone from hearing the bus driver. Barnhart then turned around and asked the adults sitting directly behind him to address the situation.

When Barnhart turned back around, the tractor and haybine Michael was operating were eighteen inches to two feet in front of the bus. Barnhart's first reaction was not to apply the brakes; rather, he swerved to the left toward and into the left lane of southbound Highway 13. However, Barnhart was unable to keep the bus from hitting the hay baler, and the bus struck the left-hand side of the implement.

According to Michael, the collision was "[a] hugh [sic] impact explosion type experience" that happened without any warning, horn honking, or screeching tires. Michael was thrown from the tractor, "just like a cannon shot me off of it." His body was airborne for fifty or sixty feet before he hit the pavement. Michael held out his hands in an attempt to break his fall, but he hit head first, bounced up and came back down on his buttocks, and then proceeded to roll, slide and scoot on the pavement. When the movement stopped, Michael was laying in a ditch, although close enough to the highway that his head and shoulders rested on the shoulder of the highway.

Michael never lost consciousness; he was unable to move initially, but later realized he could bend his legs. He was in "excruciating pain[,]" including in his back and neck area. Michael also knew his arm was mangled, back behind his shoulder blade. Michael could not actually see his arm and he "didn't know if [he] had an arm left [;] .... [he] knew [it] was screwed up."

According to Michael, as he lay there, he thought it was raining, but the sensation was caused by blood emanating from his head. He had an unquenchable thirst, his mouth was filling with blood, he was having difficulty breathing, and he thought he was dying. Bystanders gathered around him to pray, and Michael asked that a priest be called to administer the last rites.

Michael was transported to St. John's Hospital in Springfield via helicopter, and the paramedics were unable to do anything for his pain. According to Michael, "[i]t was an uncomfortable, awful ride[.]" Once Michael arrived at the hospital, in addition to severe bruising on the majority of his body, it was determined that Michael had a dislocated right shoulder, which was treated non-surgically.

Michael had also suffered "a large facial and scalp avulsion and laceration ... that was contaminated with road debris and plant debris and dirt." In the words of Dr. Robert Blair, an oral and maxillofacial surgeon at St. John's who was contacted by the trauma services to evaluate Michael when he was brought into the emergency room, Michael "was actually scalped ... starting at the eyelid and going back." The injury occurred to "the right eyelid frontal area, temporal area, and occipital area of [Michael's] head." Essentially, the injury began immediately above the right eye and continued "[t]hrough [Michael's] forehead, through the top of his head, and all the way to ... the rear of his head."

After removing the dirt, debris, and other contamination, Dr. Blair performed surgery "to reconstruct the way the tissue had been on [Michael's] scalp and eyelid and try to repair the wound as best possible." Some of the tissue was either dead or missing, requiring the surgeon to have "to adapt a flap of the ... wound to cover the ... portion of the eyelid that didn't have skin over it." Near the end of the surgery, it was also necessary to insert a

drain to allow for fluid elimination, which was removed four days after surgery.

Although the wound healed normally, Michael was unable to close his right eye. It remained open unless adhesive tape was used to keep it closed, which Michael did at night. Michael was also encouraged to stay out of the sun, and wear a large-brimmed hat and apply sun-protection cream with a high SPF (sun protection factor) if he was outside. Michael did receive a graft to the eyelid area, which allowed the eyelid to become more flexible and to close. Dr. Blair discussed with Michael some procedures that Michael might want to consider in the future, such as laser skin resurfacing or dermabrasion, but that "the eyelid is probably, other than possible laser resurfacing, is probably as good as it's probably going to be."

According to the plastic surgeon who performed the eyelid graft, Dr. Rosellen Meystrik, Michael's eyelid function, in terms of ability to close, is "pretty good[.]" However, closure may be imperfect when Michael is sleeping, which may cause dryness, tearing, and scratchiness. Those symptoms may be alleviated by artificial tear drops, but the symptoms will never completely subside without additional grafting. Michael is also prone to burning from sun exposure in the area of graft and experiences photo sensitivity in the right eye. He is required to wear dark glasses when outside. Changes in temperatures, particularly cold temperatures, will continue to cause discomfort.

The scar tissue around the right eye is much more firm to the touch than the skin around his left eye. The scarring is permanent, and as Michael ages it is likely that some of the uninjured skin will drape over the skin graft and that the eyes will become more asymmetrical because the skin around the right eye will age differently than the skin around the left eye.

There are surgical procedures that would address the asymmetrical look, which would involve surgery on the uninjured eye. In addition to the eye area, the graft was taken from behind his ear, and according to Michael, he has "a big old ugly banana scar back there where [Dr. Meystrik] removed the skin."

Michael expressed to Dr. Meystrik that he wanted to pursue other surgical options that would improve his overall look and decrease the facial disfigurement, but other than scar revisions and the surgery on the left eye mentioned previously, Dr. Meystrick did not think that there were additional procedures that would significantly change Michael's current level of disfigurement.

Those who knew Michael described him as someone without physical impairments. After the collision, however, one friend noted that Michael "looked like a Frankenstein[.]" Others noticed the discoloration of the skin in the eye area, especially when Michael is in the sun. Michael used to be quite outgoing and friendly, but the eye problem and scars made him become introverted and "more reluctant to be as open as he was before."

Prior to the collision, Michael was a farmer and also had worked as a night stocker at a local grocery store. In addition to stocking, Michael would unload trucks, handle heavy equipment and, in general, perform whatever task he was asked to do. The worst complaint received about him as an employee at the grocery store was that in the summer he might come to work a little tired after having worked in the fields all day.

After the collision, Michael could no longer perform work that required heavy lifting or any physical abilities, either at the grocery store or on the farm. He required assistance at the farm, indicating

to friends that he "just [couldn't] do that anymore." Michael now must rely on his son, Brian, to do most of the work associated with farming.

Michael's injuries also affect his ability to perform non-work activities. He used to enjoy hitting a baseball with his sons, but is no longer able to do that. His vision precludes him from participating in hunting; shooting a rifle with an open sight is not possible. Because of a fear he might be thrown off, Michael does not ride horses anymore, either as part of his work regimen, such as catching a cow, or for pleasure. The lack of physical activity has caused Michael to gain weight, and the inability to take part in physical activity has made it difficult to lose weight.

Following jury trial, at which the evidence presented above was heard, as well as additional evidence that will be discussed below in the analysis of Ryder's points, the jury returned a verdict in favor of Michael for $2,400,000. The trial court accepted the jury's verdict, entered judgment in accordance with the verdict, and later overruled Ryder's motion for new trial, or in the alternative, for remittitur. This appeal followed.

**Discussion**

Ryder raises four points on appeal, which we will address in order.

*Point I—Trial court's refusal to submit issue of comparative fault to jury*

■ In its first point, Ryder argues that the trial court erred in refusing to submit the issue of comparative fault to the jury. During the instruction conference, Ryder submitted the following instruction:

In your verdict you must assess a percentage of fault to plaintiff Michael Ruzicka, whether or not defendant was partly at fault, if you believe:

First, plaintiff Michael Ruzicka operated his equipment at a slow speed in a lane reserved for moving traffic, and

Second, the speed at which plaintiff Michael Ruzicka operated his equipment was a speed which would impede the reasonable movement of traffic, and

Third, the operation of said equipment by plaintiff Michael Ruzicka in said lane at a slow speed was not reasonably necessary for safe operation of his equipment, and

Fourth, plaintiff Michael Ruzicka was thereby negligent, and

Fifth, such negligence of plaintiff Michael Ruzicka directly caused or directly contributed to cause any damage plaintiff may have sustained.

According to Ryder, the instruction was based on MAI 37.02 [1986 New] (Comparative Fault), 17.01 [1980 Revision] (Single Negligent Act), and 17.20 [1969 New] (Stopping in Lane Reserved for Moving Traffic) (Modified). Ryder also indicated that the instruction was based on *Ogle v. Webb*, 623 S.W.2d 582 (Mo.App.1981).

■ Whether or not a jury was properly instructed is a question of law. *First State Bank of St. Charles, Mo. v. Frankel*, 86 S.W.3d 161, 173 (Mo.App.2002). Pursuant to Rule 70.02(a), an instruction "shall be given or refused by the court according to the law and evidence in the case."

■ We review a trial court's refusal to submit an instruction for abuse of discretion. *Erdman v. Condaire, Inc.*, 97 S.W.3d 85, 95 (Mo.App.2002). In reviewing the submissibility of an instruction, we view the evidence and all reasonable inferences in the light most favorable to the instruction and disregard all contrary evidence and inferences. *McCrackin v. Plummber*, 103 S.W.3d 178, 180–81 (Mo. App.2003). An instruction must be supported by substantial evidence, evidence

that, if true, is probative of the issues and from which the jury can decide the case. *First State Bank of St. Charles, Mo.*, 86 S.W.3d at 173. We will not reverse a verdict due to instructional error, including the refusal to give an instruction, unless the error was prejudicial. *Erdman*, 97 S.W.3d at 95.

Where an MAI instruction is available, its use is mandatory. *Bowman v. McDonald's Corp.*, 916 S.W.2d 270, 284 (Mo.App.1995), *overruled* on other grounds by *Richardson v. QuikTrip Corp.*, 81 S.W.3d 54, 73 n. 9 (Mo.App.2002). However, not all factual situations are covered by MAI instructions, and the ultimate test of a non-MAI instruction is whether it follows the substantive law and can be readily understood by the jurors. *Id.* The instruction must require the finding of all essential fact issues necessary to establish the legal proposition on which the right to the verdict is based and the finding of all facts necessary to support the verdict. *Id.*

No one cites any authority that farm implements cannot be driven on the highway. The legislature has recognized that a need may arise for such equipment to be driven on Missouri highways under § 314.170, RSMo 2000, which places restrictions on height, weight, and length of vehicles operating on the highways in the State, but exempts "agricultural implements operating occasionally on the highways for short distances, or to self-propelled hay-hauling equipment ...." § 304.170.12(1), RSMo 2000.

The instruction Ryder tendered modified MAI 17.20 [1969 New] (Stopping in Lane Reserved for Moving Traffic) for paragraph First to include the element of Michael operating his equipment at a slow speed in a lane reserved for moving traffic, rather than the stopping in a lane reserved for moving traffic. Ryder also indicated that the instruction was based on *Ogle* in

which this Court noted that, under certain circumstances, slowing a vehicle was negligence. *Ogle*, 623 S.W.2d at 585. We found the contributory negligence instruction in that case was erroneous because it did not provide the jury with a standard to determine when slowing would be negligence. *Id.* We further noted, given the circumstances of the case in which the evidence showed that the driver had either stopped or slowed to a speed of 10 miles per hour, that the instruction should have required the jury to find that the driver had slowed the vehicle to a speed that would impede the reasonable movement of traffic and that was not reasonably necessary for the safe operation of the vehicle. *Id.*

Within *Ogle*, we detailed other cases in which it was determined that slowing a vehicle is negligence if the slowing is sudden without a proper warning and there is no emergency to justify it, or if the resulting speed is so slow that it impedes the normal and reasonable movement of traffic. *Id.* The above conduct may constitute negligence unless the reduced speed is necessary for the safe operation of the vehicle or is in compliance with the law. *Id.*

These concepts are codified in § 304.011, RSMo 2000, which states, "No person shall drive a motor vehicle at such a slow speed as to impede or block the normal and reasonable movement of traffic, except when reduced speed is necessary for safe operation or in compliance with law." § 304.011.1, RSMo 2000. The definition of "motor vehicle" applicable to this section and others, as stated in § 301.010, RSMo 2000, specifically excludes "farm tractors." § 301.010(33), RSMo 2000. Although it may be argued that the exclusion of farm tractors from the definition of "motor vehicle" may itself preclude the use of the instruction, we will continue the analysis of

the point based on negligence and proximate cause principles.

It has also been found that negligence may be predicated on conduct that involves the slowing of a vehicle suddenly on a highway without first providing adequate and timely warning of the intention to slow. *Thienes v. Harlin Fruit Co.,* 499 S.W.2d 223, 226–27 (Mo.App.1973). That these cases, and others that are described below, involved an instruction under the contributory negligence doctrine, which Missouri rejected in 1983 in favor of comparative fault, is of no consequence to our analysis. *See Gustafson v. Benda,* 661 S.W.2d 11, 13–16 (Mo. banc 1983).

In a case that addressed an instruction based on the alleged primary negligence of the defendant, the Missouri Supreme Court determined that it was proper to submit an instruction regarding driving as close to the right-hand side of the road as possible. *Hensley v. Dorr,* 191 S.W.2d 663, 665 (Mo.1945). The Court found that the evidence justified an inference that had the defendant's vehicle been driven a few feet further to the right-hand side of the road, the collision would have been avoided. *Id.*

However, as indicated in *Hensley* and other cases, the negligence must be the proximate cause of the injuries. *Id.* In a case where a contributory negligence instruction was submitted that included the element that the driver hit from behind failed to provide a statutory warning of his intention to slow, the Court concluded that such conduct could not have been the proximate cause of the collision. *Brassfield v. Sears,* 421 S.W.2d 321, 325 (Mo.1967). The break in the causal chain occurred because there was no substantial evidence that the defendant was watching the plaintiff's car as he approached it from the rear. *Id.* Therefore, any omission of the duty to provide adequate and timely warning could not have been the proximate cause. *Id.*

In addition to the evidence in the case at bar outlined above in the facts section of this opinion, when asked whether he thought he could have avoided the collision had he kept his eyes on the road and not turned around to speak to the chaperones, Barnhart indicated that it was at least possible. When asked whether he believed Michael could have done anything to avoid the collision, Barnhart replied, "No."

As noted, no authority indicates that farm implements may not be operated on a highway when it is necessary to travel short distances. In addition, the only evidence with regard to the speed of Michael's vehicle was that he was operating it "wide open in road gear." On the theory hypothesized in the instruction, there was a lack of evidence of negligence and proximate cause to support it.

Given the circumstances of this case, we cannot find that the trial court abused its discretion in refusing to submit the comparative fault instruction tendered by Ryder. There was not substantial evidence to support it. Point I is denied.

*Point II—Evidence regarding limitations and restrictions*

■ In its second point, Ryder contends that the trial court erred in admitting evidence regarding medical restrictions Dr. Paul Arnold placed on Michael, which were contained in a particular exhibit. As this information was used by a vocational rehabilitation expert, Michael Dreiling, Ryder also argues that the trial court erred in admitting Dreiling's testimony. According to Ryder, Dr. Arnold was unable to state with a reasonable degree of medical certainty that the restrictions placed on Michael were permanent.

Dr. Arnold, a member of the medical school faculty at the University of Kansas,

with a background that included a residency in neurosurgery at the University of Illinois and a position as a spine fellow at the Medical College of Wisconsin–Milwaukee, gave two depositions, both of which were entered into evidence and played for the jury. The first was taken in October 2001 at the request of the Ruzickas' counsel, and the second in August 2002 at the request of Ryder.

Dr. Arnold treated Michael for back pain from May 2000 through July 2001. Michael presented himself to Dr. Arnold with complaints of back pain, shoulder pain, and numbness in his legs. Dr. Arnold performed a diskogram to clarify the source of Michael's pain, and determined that the most likely source of the pain was degenerative disk disease that was primarily affecting disks at L4–5 and L5–S1. Dr. Arnold recommended non-surgical treatment first, which consisted of physical therapy. Michael was also given the recommendation at some point to lose weight. According to Dr. Arnold, Michael cooperated with the recommendations and "made an effort to try to get himself better and back to the way he was[.]"

In Dr. Arnold's opinion, which he stated was being given with a reasonable degree of medical certainty, the collision was not the sole cause of Michael's problems, but that the collision did contribute to the worsening of what Dr. Arnold deemed was the already present degenerative disk disease. Dr. Arnold considered Michael's condition permanent in the sense that it was unlikely that the degenerative changes would get any better with time, and would likely worsen, unless there was some surgical intervention.

In the future, Dr. Arnold opined that Michael would likely require pain medication, continued physical therapy, and possibly epidural steroid treatments. As for surgery, Dr. Arnold testified that there was "a good possibility" Michael would require surgery, and that some doctors would likely have already performed back surgery on him. Dr. Arnold reiterated that the collision played a fairly significant role in the fact that Michael may or may not need surgery.

Dr. Arnold also discussed restrictions placed on Michael, which were contained in an exhibit (Exhibit 26) offered and admitted into evidence. Among the restrictions were that there should be no lifting on a frequent basis; Michael should only occasionally lift or carry twenty pounds three hours out of an eight-hour day; stand or walk with usual breaks three hours out of an eight-hour day; and climbing, balancing, or stooping only occasionally. All of these restrictions were related to Michael's lower back pain. Within the first deposition, Dr. Arnold indicated that Michael should continue to follow the restrictions as long as he was able and that only if he got better should he try to increase the lifting requirement. Essentially, Dr. Arnold felt that restrictions and limitations placed on Michael should continue at least for the immediate future, "unless something changes[.]"

Prior to the playing of the first videotaped deposition of Dr. Arnold, Ryder's counsel stated: "I don't have a problem with the transcript or the videotape, but I do have objections specifically to the testimony that's contained within that's [sic] been previously ruled on. That's the only problem I have." The trial judge acknowledged counsel's statement with, "All right[,]" and proceeded to admit the videotape and the transcript into evidence "over [Ryder's] objections."

Subsequent to the playing of the first deposition, there was further discussion about Exhibit 26, which contained Dr. Arnold's restrictions and limitations on Michael. Michael's counsel offered the ex-

hibit, and the following exchange took place, with Belk and Bradshaw representing Michael, and Larson representing Ryder.

[Larson]: We haven't quite gotten to the part in the deposition, Your honor where he, in my opinion, withdraws these restrictions. So I think let's reserve ruling on these restrictions until we finish this deposition.

[Bradshaw]: I think we actually—you already made that decision in our conference that they would come in and go to the weight. And that's why we had to play Arnold before we did Dr. [sic] Dreiling who's out there now to testify.

[Larson]: But Arnold's not done. We have to finish Arnold.

[Bradshaw]: Well, you took a deposition of him. Ours is completed. You came back and took a separate deposition.

[Larson]: Okay, now wait a minute here. At the start of his deposition, Your honor, this was very early in discovery, I made it clear that I was not—I did not have my information to do cross examination of him at that time. For completeness -

. . . .

[Belk]: He does state—you're talking about the part where you said, I may want to take up a follow-up deposition later?

[Larson]: Yeah.

[Belk]: There is no dispute over that. We'll agree to that. He did say I might want to take a follow up deposition later.

[The Court]: All right, I think he testified as to these restrictions. I'm going to go ahead and grant 26 over objection. It's admitted.

There was further discussion as to whether the jury should hear the second deposition immediately or later in the trial proceeding. After a fairly lengthy discussion, during which Michael's attorneys expressed their opposition to playing the second videotaped deposition immediately because other witnesses were waiting to testify live, the trial court allowed the tape to be shown, agreeing with Ryder that it was essentially a cross-examination of Dr. Arnold.

Within the second deposition, which was taken in August 2002, Dr. Arnold was initially examined by Ryder's counsel. Dr. Arnold was shown records of other doctors, dating back to 1991, showing Michael had allegedly been treated by other doctors for lower back pain prior to the collision in June 1999. The records presented showed that such treatments ended in July 1998, approximately one year prior to the collision.

After being presented with these records, Ryder asked Dr. Arnold whether he was still able to say with a reasonable degree of medical certainty that the lower back pain in May 2000 was directly caused by the collision in June 1999. Dr. Arnold responded, "Well, it would be difficult to do that." As for the restrictions, Dr. Arnold was asked whether he could, with a reasonable degree of medical certainty, relate the restrictions for Michael's lower back to the collision. Dr. Arnold responded, "Well, it would be difficult to in light of the information that you've given us."

During examination by Michael's counsel, Dr. Arnold indicated that he had been aware that Michael had some back pain prior to the collision. Michael's counsel asked the following:

Assuming that [Michael] had episodic pain prior to this collision but that following this collision, he has had constant back pain, do you believe—assuming that to be true, would you believe that the condition of his spine as it exists and the pain that he's having was directly

caused or—or contributed to be caused by this motor vehicle collision?

Dr. Arnold responded, "Then I would agree with that, yes."

Six days prior to the second deposition, Dr. Arnold had spoken with Michael who indicated that his back pain was getting worse and aggravated by heavy lifting and sneezing. As for the restrictions, Dr. Arnold felt they were still reasonable, and he would not lift them without further testing, such as an MRI, or reports from Michael that he was getting better. Dr. Arnold indicated that the restrictions have never been lifted. Assuming that Michael was pain free for approximately one year prior to surgery and had not sought treatment during that time for lower back pain, but then subsequent to the collision had experienced constant back problems, Dr. Arnold testified he would relate the restrictions to the collision. Dr. Arnold agreed that, according to the records of the previous treatment, there were no indications that Michael had been placed on any similar chronic, permanent restrictions prior to the June 1999 collision.

Dr. Arnold also testified that his opinion regarding surgery had not changed since the last deposition. In addition, Dr. Arnold was still of the opinion that Michael had degenerative disk disease prior to the collision, but that the condition was aggravated and that the collision contributed to cause Michael's current condition.

At the end of the playing of Dr. Arnold's second videotaped deposition, Ryder drew the court's attention to one line in the testimony in which, according to Ryder, Dr. Arnold stated, "So it will be difficult to say exactly what restrictions I'd place on him today without the results of the tests we've ordered, and those may lead to other tests." Ryder further noted that, although

Dr. Arnold did not appear to release Michael from the restrictions, "he never affirmatively stated that those are his restrictions today."

The trial court indicated that the portions of testimony indicated went to weight and not to admissibility. Ryder noted, "Understood, and that is my objection and I understand I'm overruled." The court responded, "Okay, you are." Ryder continued, arguing the point that Dr. Arnold had equivocated in his opinion; thus, it should go to admissibility.

The discussion continued with the judge expressing that "[i]t would have been nice if this had been in a trial brief at our pretrial conference, gentlemen. This is not a brand new issue." Michael's counsel indicated that the issue had already been ruled on by Jim Newberry, but the trial court reminded all parties that Mr. Newberry's ruling was not binding on the court because Mr. Newberry was not a judge. After further discussion, the court asked Ryder what relief it was seeking, as excluding the testimony was not possible because it was already in. Ryder indicated it would ask for a limiting instruction later. In the end, the trial court stated that he was overruling Ryder's objection.[2]

Michael Drieling, a vocational rehabilitation counselor, was later called to testify by Michael's (Ruzicka) attorneys. When evaluating Michael, Drieling considered factors such as work background, education and training for work, type of work performed, type of jobs held, kind of earnings, vocational testing, and current problems Michael was experiencing with working. Drieling noted Michael's previous work in the labor market such as farming and working in a grocery store, and also more recent work as a delivery driver. In addition, Drieling considered medical in-

---

2. The record is silent as to Jim Newberry's capacity in this case.

formation, including the restrictions contained in Dr. Arnold's report.

According to Drieling's evaluation, Michael's employability after the collision was limited, and his ability to perform physically-oriented work was significantly restricted. At the time of the evaluation, Michael was working part-time at $8 per hour, which Drieling thought was reflective of Michael's earning capacity in the labor market, taking into account his current vocational profile. Regarding Michael's employability prior to the collision, Drieling found that Michael was able to perform physical-type work, including heavy manual labor, and other physically-oriented work that would generate higher salaries in the labor market. Drieling considered Michael's pre-collision earning capacity to be $13 per hour. Thus, according to Drieling, Michael's lost income potential resulted in a $5 per hour difference between pre-collision and post-collision. Drieling did not take into account any factors relating to farming and farming income.

During Drieling's testimony, Ryder's counsel commented, "I think he based a lot of this on the restrictions from Dr. Arnold"; however, no actual objection appears in the record. On cross-examination, Drieling indicated that he had read Dr. Arnold's first deposition and, as stated previously, used the restrictions Dr. Arnold had developed in July 2000.

There was also testimony from two chiropractors; one who had seen Michael before and after the collision (Dr. Gerald Porter) and another who had only treated Michael prior to the collision (Dr. Carl Blomenkamp). Dr. Porter saw Michael ten times between May 1994 and July 1998 and then did not see him again until July 1999, approximately one month after the collision. In Dr. Porter's opinion, Michael had a healthy spine prior to the collision.

In July 1999, Dr. Porter diagnosed Michael with acute multi-level spinal trauma associated with the right shoulder injury and acute multi-level spinal trauma, as every level of the spine had symptoms associated with it, including pain, tenderness, and spasms in the lower lumbar spine. Dr. Porter admitted that the treatments did not focus on the lower spine during the visits after the collision, but also indicated that there was limited back manipulation in an effort to not reproduce the shoulder dislocation. An offer of proof regarding Dr. Porter's post-collision treatment of the lower back was refused.

Dr. Blomenkamp only saw Michael pre-collision from 1991 through 1996, and during that time adjusted Michael's lumbar spine three times. Dr. Blomenkamp saw no evidence of disk injury during those visits, but admitted treatment was related to Michael's complaints of low back pain.

Michael testified that he experienced back pain within seven days of the collision. He also indicated that the back pain was among the pain he felt almost everywhere in his body.

 In general, the trial court's decision to admit expert testimony is reviewed for abuse of discretion. *M.C. v. Yeargin*, 11 S.W.3d 604, 618 (Mo.App. 1999). Under this standard, we will reverse only if the ruling is so arbitrary and unreasonable as to shock the sense of justice and indicates a lack of careful and deliberate consideration by the trial court. *Whitman's Candies, Inc. v. Pet Inc.*, 974 S.W.2d 519, 527 (Mo.App.1998).

 "When a party relies on expert testimony to provide evidence as to causation when there are two or more possible causes, that testimony must be given to a reasonable degree of certainty." *Mast v. Surgical Services of Sedalia, L.L.C.*, 107 S.W.3d 360, 373 (Mo.App.2003). If an ex-

pert uses equivocal language, such testimony is considered devoid of evidentiary value. *Abbott v. Haga,* 77 S.W.3d 728, 732 (Mo.App.2002).

We are concerned here about the lack of specific objections on the record. There was some reference to an earlier ruling, which was apparently not made by a judge, regarding Dr. Arnold's testimony about the restrictions he placed on Michael, and at trial Ryder appeared to state that it was making the same or similar objections it had made earlier. However, that earlier ruling is not provided in the record.

Following the playing of the Dr. Arnold's second deposition, Ryder made an argument that Dr. Arnold was equivocal in his language in the second deposition, and the trial court noted the testimony went to weight and not admissibility. Ryder indicated it understood that its objection was being overruled, the trial court noted the testimony had already been admitted, Ryder mentioned it would later ask for a limiting instruction, and the trial court clarified that it was overruling Ryder's objection.

During Drieling's testimony, there was, at best, a passing comment from Ryder's counsel that Drieling was basing a lot of his information on Dr. Arnold's restrictions. However, rather than an objection, Ryder's counsel followed that comment with, "I'll shut up. I'm sorry."

■■ There is no question that during the second deposition of Dr. Arnold, Ryder clearly examines Dr. Arnold about the degree of medical certainty. Thus, it may not be necessary for us to employ only a plain error review. *See Williams v. Daus,* 114 S.W.3d 351, 363 (Mo.App.2003). Of course, we use plain error review rarely in civil cases and only where the error affected substantial rights and a manifest injustice or miscarriage of justice resulted

therefrom. *Davolt v. Highland,* 119 S.W.3d 118, 135 (Mo.App.2003); *Smith v. White,* 114 S.W.3d 407, 412 (Mo.App.2003).

Given the circumstances of this case, there was no plain error. In addition, assuming that proper objections were made, we cannot find that the trial court abused its discretion in admitting the evidence and in determining that testimony regarding Dr. Arnold's restrictions went to weight and not admissibility. Point II is denied.

*Point III—Questions about advance payment made to Michael*

■■ In Point III, Ryder argues that the trial court erred in permitting Michael's counsel to question Michael concerning the source of a $10,000 advance payment paid to him by a "Ryder company." According to Ryder, the testimony improperly and prejudicially injected the issue of insurance before the jury. Michael counters that, aside from a failure to object to the testimony, Ryder invited the testimony through previous statements made by Ryder during voir dire or elicited during its questioning of Michael about the advance payment.

During its opening statement, Ryder expressed that the evidence would show, among other things, that during "that same summer [as the collision] we paid [Michael] $10,000.00 on account in advance of getting here." The context of the statement was that, even though an advance payment had been made, that did not mean that Ryder had to pay Michael everything for which he asked in this lawsuit.

As it presented its case at trial, Ryder was allowed to recall Michael as a witness. The following exchange occurred.

[Ryder]: Mr. Ruzicka, did we pay you for your property damage to your equipment, sir?

[Michael]: You did.

[Ryder]: Let me show you what's been marked for identification purposes as Defendant's Exhibit II or double I. Do you recognize that, sir?

[Michael]: I do.

[Ryder]: And does that have your signature on it, sir?

[Michael]: It does.

> [Ryder]: We would offer Defendant's Exhibit II.
>
> [Michael's counsel]: No objection.
>
> [Trial court]: Admitted without objection, Defendant's Exhibit II.

. . . .

[Ryder]: Pursuant to Defendant's Exhibit II, Mr. Ruzicka, were you advanced—was an advance payment made to you with regard to this accident of a date of June 11, 1999?

[Michael]: Yes.

[Ryder]: And the amount of that payment was $10,000?

[Michael]: Yes.

[Ryder]: And pursuant to this agreement did you agree, sir, that you would give us a credit against your total claim for the amount that we've advanced to you, sir?

[Michael]: Yes.

[Ryder]: That's all I have on that.

Ryder then asked to publish two additional exhibits, pictures of the haybine. When that was complete, Michael's counsel asked for a sidebar, at which they asked the trial court to allow them to interject liability and insurance of Ryder's carrier, arguing that Ryder had put that into issue by using "we." Michael's counsel further argued that the jury had received an impression as to who made the payment, even though the payment came from a third party. Therefore, Michael's counsel made a request that they be allowed to ask who made the payment. The trial court refused the request. When Michael's counsel indicated that there were cases on point, the trial judge indicted he would "look at the case at that time."

After the trial court returned from a noon recess, the court indicated it had considered some case law and determined Michael's counsel should be allowed to ask the following question: "Did Ryder make the payment for $10,000.00 or some other entity actually make the payment to you?" The court further noted that Michael would provide the following answer: "It was someone else." As Ryder attempted to make additional comments on the issue, the court stated, "That finishes that particular item. There will be no additional retaliatory remarks to be made in closing statements or elsewhere."

There was some additional discussion about an exhibit that purported to be an indemnification agreement between Old Republic Insurance Company and Ryder System, Inc. The court, however, noted that its ruling was based on who wrote the check for the advanced payment, and not who was ultimately responsible for it.

During plaintiff's evidence in rebuttal, Michael was recalled as a witness and asked by his counsel, "Mr. Ruzicka, did Ryder make the payment for $10,000.00 or [did] some other entity actually make the payment to you?" Michael responded, "It was not Ryder. It was someone else." There were no further questions of Michael by either his counsel or Ryder's, and Ryder did not object to the question regarding whether Ryder was the advance payment source.

According to its motion for new trial and in an affidavit signed November 20, 2002, the payment was made by Ryder Truck Rental, Inc., which is a subsidiary of Ryder Systems, Inc. that administers and pays all losses for the parent company,

Ryder Systems, Inc. Ryder Systems, Inc. is also the parent company of Ryder Student Transportation Services, Inc., which is the defendant in this lawsuit and the Ryder referenced in this opinion and at trial.

Ryder is correct that, in general, it is improper to inject the issue of liability insurance into an action for damages. *Banks v. Village Enter., Inc.*, 32 S.W.3d 780, 793 (Mo.App.2000). An injection of insurance can constitute reversible error, particularly if done so in bad faith. *Taylor v. Republic Auto. Parts, Inc.*, 950 S.W.2d 318, 321 (Mo.App.1997). The trial court is in a much better position to determine good faith or bad faith and to judge the effect on the jury. *Id.* In addition, not every reference constitutes reversible error and the party alleging such must demonstrate prejudice as well. *Hudson v. Whiteside*, 34 S.W.3d 420, 425 (Mo.App. 2000). A trial court's ruling in this regard is reviewed under an abuse of discretion standard, and we will reverse only where there is a manifest abuse of that discretion. *Ballinger v. Gascosage Elec. Coop.*, 788 S.W.2d 506, 520 (Mo. banc 1990), *overruled* on other grounds by *Zueck v. Oppenheimer Prop., Inc.*, 809 S.W.2d 384, 384 (Mo. banc 1991).

Under § 490.715, RSMo 2000, "[i]f prior to trial a defendant or his insurer or authorized representative, or any combination of them, pays all or any part of a plaintiff's special damages, the defendant may introduce evidence that some other person other than the plaintiff has paid these amounts. The evidence shall not identify the person having made such payments." § 490.715.2, RSMo 2000. Further, if a defendant introduces such evidence, "such introduction shall constitute a waiver of any right to a credit against a judgment pursuant to section 490.710." § 490.715.3, RSMo 2000. Section 490.710,

RSMo 2000, provides that "the fact that such payments have been made shall not be brought to the attention of the jury." § 490.710.2, RSMo 2000.

In case law interpreting these statutes, it has been found that § 490.710, RSMo 2000, by its plain wording, generally precludes the introduction into evidence of one party's advance payment of another party's damages and thus, such evidence should not be brought to the attention of the jury. *Derossett v. Alton and Southern Ry. Co.*, 850 S.W.2d 109, 112 (Mo.App. 1993). However, § 490.715, RSMo, allows evidence to be introduced that informs the jury that someone other than the plaintiff has paid those amounts. *Id.* This is true, as long as the person paying those amounts is not identified. § 490.715.2, RSMo 2000.

Given the circumstances of this case, we cannot find that the trial court abused its discretion in allowing Michael's counsel to ask Michael to clarify that Ryder was not the source of those payments, after Ryder had earlier identified itself as the source, even though as Ryder admits in its brief, "Ryder's misidentification of the source of the advance payment was unfortunate[.]" No prejudice occurred. Point III is denied.

*Point IV—Remittitur*

In its final point, Ryder contends that the trial court erred and abused its discretion by refusing to remit the jury's award of $2,400,000 in favor of Michael. According to Ryder, Michael's injuries, physical limitations, scarring, and loss of earning capacity did not rise to the level necessary to warrant the jury's award. Ryder was willing to concede to a verdict of $750,000, if it was acceptable to Michael.

Section 537.068, RSMo 2000, permits a trial court to enter remittitur "if, after reviewing the evidence in support of

the jury's verdict, the court finds that the jury's verdict is excessive because the amount of the verdict exceeds fair and reasonable compensation for plaintiff's injuries and damages." *Gomez v. Constr. Design, Inc.*, 126 S.W.3d 366, 375 (Mo.banc 2004). A trial court has great discretion in approving the verdict or setting it aside as excessive. *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 872 (Mo.banc 1993). We will interfere with the judgment of the trial court and jury only if the verdict is manifestly unjust. *Gomez*, 126 S.W.3d at 375.

A contention that a jury verdict is excessive does not in and of itself entitle a defendant to relief on appeal. *Carter v. St. John's Reg'l Med. Ctr.*, 88 S.W.3d 1, 21 (Mo.App.2002). In determining whether a verdict is manifestly unjust, we view the evidence in the light most favorable to the verdict. *Gomez*, 126 S.W.3d at 376. A jury is in the best position to make a determination as to what amount will fairly and reasonably compensate a plaintiff for his damages. *Callahan*, 863 S.W.2d at 872. The trial court and the jurors have the superior vantage point to view the evidence, observe the witnesses, and evaluate their credibility. *Gomez*, 126 S.W.3d at 376.

Among the factors the jury may consider in arriving at its verdict are nature and extent of the injuries, diminished earning capacity, economic conditions, plaintiff's age, and awards in comparable cases. *Callahan*, 863 S.W.2d at 872. In addition, the jury is entitled to consider various intangibles, which are much more difficult to precisely quantify, such as past and future pain and suffering, effect on lifestyle, embarrassment, humiliation, and economic loss. *Id.* The range between an inadequate verdict and an excessive one is large, and the jury is allowed nearly unfet-

tered discretion if the damages are within that range. *Id.*

The evidence showed that Michael incurred medical expenses in the amount of $43,732.03, and may require additional surgery for the eye for $2,000 and back for $25,000. Based on the calculations provided in Drieling's testimony, Michael's projected earnings loss over his lifetime is $302,206.

Given the facts of this case, the factors the jury may consider, and our standard of review, we cannot find that the trial court abused its discretion in refusing to remit the jury's verdict. Point IV is denied.

### Conclusion

The judgment is affirmed.

BARNEY, P.J., and GARRISON, J., concur.